# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| **JAMES BRIGGS,** | : |
| | : |
| **PLAINTIFF,** | : |
| **Individually and on behalf of all** | : |
| **other persons similarly situated** | : |
| | : **CIVIL ACTION NO. 3:12cv324(VLB)** |
| | : |
| **v.** | : **DECEMBER 4, 2012** |
| | : |
| **RODERICK BREMBY, in his official capacity** | : |
| **as Commissioner of the State of** | : |
| **Connecticut Department of Social Services,** | : |
| **DEFENDANT.** | : |

## MEMORANDUM OF DECISION DENYING DEFENDANT'S [DKT. #19] MOTION TO DISMISS AND GRANTING PLAINTIFFS' MOTION [Dkt. #2] FOR PRELIMINARY INJUNCTION

The Plaintiff, James Briggs, individually and on behalf of all other persons similarly situated brings this action against Roderick Bremby, in his official capacity as the Commissioner of the Department of Social Services, for failing to provide timely benefits in violation of the Food and Nutrition Act of 2008, formerly known as the Food Stamp Act, 7 U.S.C. §2020 ("FSA").  Before the Court is Plaintiffs' motion for preliminary injunction pursuant to Fed. R. Civ. P. 65 seeking to enjoin the Defendant from failing or refusing to timely process all applications for food stamps and to provide foods stamps on a timely basis to all eligible households and individuals.  Also before the Court is Defendant's motion to dismiss Plaintiffs' complaint pursuant to Fed. R. Civ. 12(b)(6).  Defendant argues that the complaint must be dismissed and the motion for preliminary injunction denied because individuals have no right to enforce the FSA.  For the foregoing

reasons, the Court finds that the FSA creates a private right of action enforceable under 42 U.S.C. § 1983.  The Court therefore denies Defendant's motion to dismiss and grants Plaintiffs' motion for a preliminary injunction.

**Background**

i.      **Factual Allegations**

Plaintiffs are indigent individuals seeking benefits from the Supplemental Nutrition Assistance Program ("SNAP") commonly known as food stamps from the Connecticut Department of Social Services ("DSS").  [Dkt. #1, Compl., ¶1].

Plaintiffs allege that DSS has failed to ensure the processing of food stamp applications in a timely manner on a state wide basis. *Id.* at ¶2.  Federal government provides complete funding to the states for all benefits under the Food Stamp Program and at least 50% of the states' administrative costs involved in the operation of the program.  *Id.* at ¶20.  Each state must designate a single state agency responsible for administering the Food Stamp Program and complying with federal food stamp statutory and regulatory requirements.  *Id.* at ¶21.  DSS is the single state agency in Connecticut responsible for administering the Food Stamp Program.  *Id.* at ¶22.

The FSA and implementing regulations of the Food and Nutrition Service ("FNS") of the U.S. Department of Agriculture require DSS to process food stamp applications on a timely basis.  DSS must provide food stamps to eligible applicants no later than 30 calendar days after date of application. *Id.* at ¶24 (citing 7 U.S.C. §2020(3)(3); 7 C.F.R. §§273.2(a), (g)(1)).

2

Expedited issuance of food stamps is available to households in immediate need: (1) those with very low gross income and liquid resources (less than $150 per month and no more than $100, respectively); (b) those with combined gross income and liquid resources that are less than the monthly household rent or mortgage, and utilities; and (c) those constituting destitute migrant or seasonal farmworker households. *Id.* at ¶25 (citing  7 U.S.C. §2020(e)(9); 7 C.F.R. §273.2(a)(2), (i)(1)). Expedited food stamps must be provided to eligible households no later than the seventh calendar day following date of application. *Id.* at ¶26 (citing 7 U.S.C. §2020(e)(9)(A); 7 C.F.R. § 273.2 (i)(3)(i)).

DSS and FNS gave a joint presentation to the Connecticut General Assembly and DSS reported a six-month average of 16,041 food stamp applications per month.  DSS has "described the agency's food stamp 'timeliness rate' as follows: 2006 – 81.43%, 2007 – 82.99%, 2008 – 83.01%, 2009 – 79.11%, 2010 – 59.49%." *Id.* at ¶29.  DSS submitted a Food Stamp Corrective Action Plan to FNS in May 2008 stating that "CT has an unacceptable rate of timeliness in application processing." *Id.* at ¶30.

The named Plaintiff, Mr. Briggs, applied for food stamps on January 20, 2012. *Id.* at ¶31.   On February 19, 2012, Briggs received a request for verification from DSS dated February 9, 2012 asking for proof of citizenship which he faxed on February 10, 2012.  *Id.* at ¶32. Mr. Briggs received a notice from DSS dated February 22, 2012 stating that his application was delayed since it still needed verification. *Id.* at ¶33.  Mr. Briggs unsuccessfully tried to reach DSS at the telephone number listed on the written notice several times.  *Id.*

The named Plaintiff brings this action on behalf of a class defined as follows: "All Connecticut residents who, since March 5, 2009 have applied, are applying, or will apply for food stamps from the Connecticut Department of Social Services." *Id.* at ¶10.

Plaintiffs' first claim is for violation of the Food Stamp Act,  7 U.S.C. §2020(e)(3) and 7 C.F.R. §273.2(a)(2), (g)(1) for failing to provide food stamps benefits within 30 days of the date of application pursuant to Section 1983.  *Id.* at ¶37.

Plaintiffs' second claim is for violation of the Food Stamp Act, 7 U.S.C. §2020(e)(9)(A) and 7 C.F.R. §273.2(a)(2), (i)(2), (i)(3)(i) for failing to provide food stamps benefits on an expedited basis within 7 days of the date of application pursuant to Section 1983. *Id.* at ¶39.

Plaintiffs seek declaratory and injunctive relief.  Plaintiffs seek a declaratory judgment declaring that the Defendant's policies and practices violated the FSA and the implementing regulations of the FNS.  Plaintiff also seek preliminary and permanent injunctive relief requiring Defendant to process all application for food stamps and issue benefits within the time frames mandated by the FSA and the implementing regulations promulgated by FNS.

ii.    Statutory Scheme

The FSA, originally enacted August 31, 1964, "is a complex federal funding statute that grants monies to the states for the operation of food stamp programs."  W*illiston v. Eggleston*, 379 F.Supp.2d 561, 564 (S.D.N.Y. 2005) (citing

Public Law 88–525; 78 STAT. 703).  The FSA authorized the establishment of a supplemental nutrition assistance program to alleviate "hunger and malnutrition" and designed to "permit low-income households to obtain a more nutritious diet through normal channels of trade by increasing food purchasing power for all eligible households who apply for participation."  7 U.S.C. §2011.

The Act mandates that the Secretary of Agriculture "shall issue such regulations consistent with this chapter as the Secretary deems necessary or appropriate for the effective and efficient administration of the supplemental nutrition assistance program." 7 U.S.C. 2013(c). The Act further provides that "[a]ssistance under this program shall be furnished to all eligible households who make application for such participation."  7 U.S.C. §2014(a).

Section 2020 governs the administration of the food stamp program and provides that the "State agency of each participating State shall have responsibility for certifying applicant households and issuing EBT cards."  7 U.S.C. §2020(a).  Each State agency "shall submit for approval a plan of operation specifying the manner in which such program will be conducted within the State in every political subdivision."  7 U.S.C. §2020 (d).  Section 2020(e) is titled the "[r]equisites of State plan of operation" and enumerates various requirements that each "State plan of operation … shall provide."   Under Section 2020(e)(3), one requisite of the State plan of operation is that the "State agency shall … promptly determine the eligibility of each applicant household by way of verification of income … so as to complete certification of and provide an allotment retroactive to the period of application to any eligible household not

later than thirty days following its filing of an application, and that the State agency shall provide each applicant household, at the time of application, a clear written statement explaining what acts the household must perform to cooperate in obtaining verification and otherwise completing the application process." 7 U.S.C. §2020 (e)(3).

Another requisite of the State plan of operation is that the "State agency shall ... provide benefits no later than 7 days after the date of application to any household which … has gross income that is less than $150 per month; or … is a destitute migrant or a seasonal farmworker household in accordance with the regulations governing such households in effect July 1, 1982; and … has liquid resources that do not exceed $100…[and] provide benefits no later than 7 days after the date of application to any household that has a combined gross income and liquid resources that is less than the monthly rent, or mortgage, and utilities of the household."  7 U.S.C. §2020 (e)(9).

Under the subsection entitled "State noncompliance; correction of failures," the Act provides that

> If the Secretary determines, upon information received by the Secretary, investigation initiated by the Secretary, or investigation that the Secretary shall initiate upon receiving sufficient information evidencing a pattern of lack of compliance by a State agency of a type specified in this subsection, that in the administration of the supplemental nutrition assistance program there is a failure by a State agency without good cause to comply with any of the provisions of this chapter, the regulations issued pursuant to this chapter, the State plan of operation submitted pursuant to subsection (d) of this section, the State plan for automated data processing submitted pursuant to subsection (o)(2) of this section, or the requirements established pursuant to section 2032 of this title the Secretary shall immediately inform such State agency of such failure and shall allow the

6

**State agency a specified period of time for the correction of such failure. If the State agency does not correct such failure within that specified period, the Secretary may refer the matter to the Attorney General with a request that injunctive relief be sought to require compliance forthwith by the State agency and, upon suit by the Attorney General in an appropriate district court of the United States having jurisdiction of the geographic area in which the State agency is located and a showing that noncompliance has occurred, appropriate injunctive relief shall issue, and, whether or not the Secretary refers such matter to the Attorney General, the Secretary shall proceed to withhold from the State such funds authorized under sections 2025(a), 2025(c), and 2025(g) of this title as the Secretary determines to be appropriate, subject to administrative and judicial review under section 2023 of this title."**

**7 U.S.C. §2020 (g).**

**Under the Act's "Violations and Enforcement" section, it also provides that "[n]otwithstanding any other provision of this chapter, the Secretary may provide for the issuance or presentment for redemption of benefits to such person or persons, and at such times and in such manner, as the Secretary deems necessary or appropriate to protect the interests of the United States or to ensure enforcement of the provisions of this chapter or the regulations issued pursuant to this chapter" and that the "[b]enefits issued pursuant to this chapter shall be deemed to be obligations of the United States within the meaning of section 8 of Title 18." 7. U.S.C. §2024(a) and (d).**

**A.  Motion to Dismiss**

**Legal Standard**

**"'To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Sarmiento v. U.S.*, 678 F.3d 147 (2d Cir. 2012)(quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  While Rule 8 does not require detailed factual allegations,**

"[a] pleading that offers 'labels and conclusions' or 'formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (citations and internal quotations omitted).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.' " *Id.* (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 557 (2007)).  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (internal citations omitted).

In considering a motion to dismiss for failure to state a claim, the Court should follow a "two-pronged approach" to evaluate the sufficiency of the complaint. *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010).  "A court 'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'" *Id.* (quoting *Iqbal*, 129 S.Ct. at 1949-50).  "At the second step, a court should determine whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Iqbal*, 556 U.S. 679).  "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (internal quotations omitted).

**Analysis**

The Plaintiffs allege that they are entitled to relief under Sections 2020(e)(3) and (9) of the FSA in connection with the untimely processing of their food stamp applications.  The Defendant seeks to dismiss the complaint on the basis that the FSA does not provide for a private right of action and therefore argues that the Plaintiffs have failed to state a claim upon which relief can be granted.

42 U.S.C. §1983 imposes liability on any person who, under color of law, "subject, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and law."  Section 1983 "provides a cause of action for violations of federal statutes as well as the Constitution, but plaintiffs must establish the violation of a federal *right,* not just the violation of federal law." *M.K.B. v. Eggleston*, 445 F.Supp.2d 400, 427 (S.D.N.Y. 2006) (citing *Maine v. Thiboutot,* 448 U.S. 1, 4 (1980)).

"It has been long recognized that the pertinent question in determining whether a statute provides a basis for a § 1983 suit is whether Congress intended to create individual rights binding on States-as opposed to mere 'precatory terms' that do not 'unambiguously' create state obligations, or 'generalized,' '*systemwide* ' duties on States."  *Gonzaga University v. Doe*, 536 U.S. 273, 300-01 (2002) (Stevens, J., dissenting) (quoting *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 17, 18 (1981) and *Blessing v. Freestone*, 520 U.S. 329, 343 (1997)) (emphasis in the original).

9

The Supreme Court in *Gonzaga University v. Doe* clarified the standard articulated in *Blessing v. Freestone* for determining whether a statute gives rise to an individual right enforceable under Section 1983.  In *Blessing*, the Supreme Court explained that "[f]irst, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory rather than precatory terms."  *Blessing*, 520 U.S. at 340-41.

In *Gonzaga*, the Supreme Court made clear that it is insufficient for the plaintiff to fall "within the general zone of interest that the statute is intended to protect."  *Gonzaga*, 536 U.S. at 283.   The Supreme Court explained that only "*rights,* not the broader or vaguer 'benefits' or 'interests" may be enforced under §1983.  *Id.* at 275 (emphasis in the original).  Such rights must be "unambiguously conferred" as reflected in the text and structure of the statute by "rights-creating language" and have an individual rather than aggregate focus.  *Id.* at 273-75, 283, 286-89.  A provision has an aggregate focus where it is not concerned with "whether the needs of any particular person have been satisfied" but is instead concerned with the aggregate services, policies or practices of the chartered agency.  *Id.* at 274-275.

"Once a plaintiff demonstrates that a statute confers an individual right, the right is presumptively enforceable by § 1983." *Id.* at 284.  However, the "Sate may

rebut this presumption by showing that Congress 'specifically foreclosed a remedy under § 1983.'" *Id.* at 285 n.4 (quoting *Smith v. Robinson,* 468 U.S. 992, 1004-1005, n. 9 (1984)).  "The State's burden is to demonstrate that Congress shut the door to private enforcement either expressly, through specific evidence from the statute itself, or impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983."  *Id.* (internal quotation marks and citations omitted).

A number of district courts in the Second Circuit pre and post *Gonzaga* have concluded that there is a private right of action under the FSA.  *See, e.g., M.K.B. v. Eggleston*, 445 F.Supp.2d 400 (S.D.N.Y. 2006); *Williston v. Eggleston*, 379 F.Supp.2d 561 (S.D.N.Y. 2005); *Reynolds v. Giuliani*, No.98Civ.877(WHP), 2005 WL 342106 (S.D.N.Y. Fen. 14, 2005), *Walker v. Eggleston*, No.04Civ.0369 (WHP), 2005 WL 639584 (S.D.N.Y. Mar. 21, 2005); *Reynolds v. Giuliani*, 118 F.Supp.2d 352, 382-84 (2000).  In addition, both the Fifth and Eleventh Circuits applying a pre-*Gonzaga* analysis have likewise concluded that the FSA creates enforceable rights within the meaning of Section 1983.  *See Victorian v. Miller*, 813 F.2d 718 (5th Cir. 1987); *Gonzalez v. Pingree,* 821 F.2d 1526, 1531 (11th Cir.1987).  Although the Second Circuit has not addressed the particular question at issue, it has addressed a similar question presented under the Medicaid Act concluding there was a private right of action under that provision. *See Rabin v. Wilson-Coker*, 362 F.3d 190 (2d Cir. 2004).

Defendant argues that the district courts in the Second Circuit which have found a private right of action and the Second Circuit's decision in *Rabin*

**misapply the standard articulated in *Gonzaga*. Defendant contends that the rationale applied by the Supreme Court in *Gonzaga* and to a lesser extent *Blessing* compels the conclusion that Section 2020(e)(3) and (9)'s 30 day and 7 day respective application processing requirements are broader or vaguer benefits as opposed to enforceable rights because the FSA has an aggregate not individual focus and lacks any rights-creating language. Defendant relies primarily on an opinion from a non-binding Western District of Texas case which he argues correctly applied *Gonzaga*. *See Howard v. Hawkins*, No.A-09-CA-577-SS (W.D. Tex. 2009) [the decision is attached in slip-opinion form to Defendant's motion. Citations herein are to the slip-opinion].**

**In *Gonzaga*, the Supreme Court concluded that a provision of the Family Education Rights and Privacy Act ("FERPA") did not confer an enforceable right. At issue was the following section of FERPA which provided that "[n]o funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of permitting the release of education records (or personally identifiable information contained therein ...) of students without the written consent of their parents to any individual, agency, or organization." *Id.* at 279 (quoting 20 U.S.C. § 1232g(b)(1)). The Supreme Court explained that the provision lacked the "sort of 'rights-creating' language critical to showing the requisite congressional intent to create new rights" as the provisions "speak only to the Secretary of Education, directing that '[n]o funds shall be made available' to any 'educational agency or institution' which has a prohibited 'policy or practice.'" *Id.* at 287 (citations omitted). The Supreme Court**

memorably concluded this provision's focus was "two steps removed from the interests of individual students and parents and clearly does not confer the sort of '*individual* entitlement' that is enforceable under § 1983."  *Id.* (emphasis in the original).  The Supreme Court emphasized that there can be no enforceable rights where the statute focuses on the regulated agency rather than the individuals protected. *Id.* (citing *Alexander v. Sandoval*, 532 U.S. 275, 289 (2001)).  The FERPA provision at issue had an aggregate focus because it spoke "only in terms of institutional policy and practice, not individual instances of disclosure" and was not concerned with "whether the needs of any particular person have been satisfied."  *Id.* at 288 (internal quotation marks and citation omitted).  Because the provision was not phrased in the terms of the person benefited but instead a as a funding prohibition, it did not create a private a right of action.

        In coming to its conclusion, the Supreme Court contrasted the provision in FERPA with Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972 whose statutes the Supreme Court pointed out were phased with "an unmistakable focus on the benefited class." *Id.* at 284 (internal quotation marks and citations omitted).  "Title VI provides: '*No person* in the United States *shall ...* be subjected to discrimination under any program or activity receiving Federal financial assistance' on the basis of race, color, or national origin."  Id. at 284n.4 (quoting 78 Stat. 252, 42 U.S.C. § 2000d (1994 ed.)) (emphasis in the original).  "Title IX provides:  '*No person* in the United States *shall,* on the basis of sex, ... be subjected to discrimination under any education program or activity receiving Federal financial assistance.'"  *Id.* at 284n.4 (quoting 86 Stat. 373, 20

U.S.C. § 1681(a)) (emphasis in the original).  The Supreme Court explained that Title VI and Title IX did contain explicit right-or duty-creating language as opposed to FERPA. *Id.*  In the instant case, Defendant makes this same comparison to support his argument that the FSA provisions at issue do not focus on the benefited class but rather on the state agency.

Lastly, the Supreme Court reasoned that its conclusion that FERPA's nondisclosure provisions fail to confer enforceable rights were "buttressed by the mechanism that Congress chose to provide for enforcing these provisions." *Id.* at 289.  The Supreme Court pointed out that Congress expressly authorized the Secretary to deal with violations of the Act and that the Act required the Secretary to establish a review board.  *Id.*  FERPA provides in relevant part that a board shall be established "for the purpose of investigating, processing, reviewing, and adjudicating violations of this section and complaints which may be filed concerning alleged violations of this section." The Supreme Court concluded that these "administrative procedures squarely distinguish this case from *Wright* and *Wilder*, where an aggrieved individual lacked any federal review mechanism … and further counsel against our finding a congressional intent to create individually enforceable rights."  536 U.S. at 289-90 (citing *Wright v. City of Roanoke Redevelopment and Housing Authority*, 479 U.S. 418 (1987) and *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498 (1990)).  The Supreme Court noted that it need not determine whether FERPA's procedures were sufficiently comprehensive to offer an independent basis for precluding enforcement due to its finding that FERPA creates no private right to enforce.  *Id.* at 290 n.8.

In *Blessing*, the Supreme Court held that Title IV-D of the Social Security Act which required States receiving welfare funds to "substantially comply" with the requirements designed to ensure timely payment of child support did not create an enforceable right. To qualify for federal funds under Title IV-D, the "State must certify that it will operate a child support enforcement program that conforms with the numerous requirements set forth in Title IV–D of the Social Security Act" and "will do so pursuant to a detailed plan that has been approved by the Secretary of Health and Human Services." *Blessing*, 520 U.S. at 333. In addition, the "structure of each State's Title IV–D agency, like the services it provides, must conform to federal guidelines" including creating separate units to administer the program, disbursing collected funds, providing staffing at certain levels, and implementing a computer data system that meet numerous federal specifications. *Id.* at 334. "To oversee this complex federal-state enterprise, Congress created the Office of Child Support Enforcement (OCSE) within the Department of Health and Human Services (HHS). This agency is charged with auditing the States' compliance with their federally approved plans. Audits must occur at least once every three years, or more often if a State's performance falls below certain standards. If a State does not 'substantially comply' with the requirements of Title IV–D, the Secretary is authorized to penalize the State by reducing its Aid to Families with Dependent Children ("AFDC") grant by up to five percent." *Id.* (citations omitted). The Supreme Court explained that the lower court's holding "paint[ed] with too broad a brush" and that it "was incumbent upon respondents to identify with particularity the rights

they claimed, since it was impossible to determine whether Title IV-D, as an undifferentiated whole, gives rise to undefined 'rights.'" *Id.* at 342.

The *Blessing* court explained that the requirement that a State agency operate its program in substantial compliance with Title IV-D "was not intended to benefit individual children and custodial parents… Far from creating an *individual* entitlement to services, the standard is simply a yardstick for the Secretary to measure the *systemwide* performance of a State's Title IV–D program.  Thus, the Secretary must look to the aggregate services provided by the State, not to whether the needs of any particular person have been satisfied." *Id.* at 343. Consequently, the court of appeals erred "in taking a blanket approach to determining whether Title IV–D creates rights.  It is readily apparent that many other provisions of that multifaceted statutory scheme do not fit our traditional three criteria for identifying statutory rights.  To begin with, many provisions, like the 'substantial compliance' standard, are designed only to guide the State in structuring its systemwide efforts at enforcing support obligations. These provisions may ultimately benefit individuals who are eligible for Title IV–D services, but only indirectly." *Id.* at 344. The Supreme Court explained that the numerous requirements for the States' data processing system are "complex standards" which do not give rise to individualized rights to computer services. They are simply intended to improve the overall efficiency of the States' child support enforcement scheme." *Id.*  In addition, the regulations regarding sufficient staffing do not give rise to federal rights because "the link between increased staffing and the services provided to any particular individual is far too

tenuous to support the notion that Congress meant to give each and every Arizonan who is eligible for Title IV–D the right to have the State Department of Economic Security staffed at a 'sufficient' level." *Id.* at 345.

Notably the Supreme Court did not foreclose the possibility that Title-IV D gives rise to some individually enforceable rights. *Id.*  Indeed, the Supreme Court suggested in dicta that 42 U.S.C. §657 may give individuals a federal right.  Under Section 657, recipients must assign their child support rights to the State and fully cooperate with the State's efforts to establish paternity and obtain support payments. "Although the State may keep most of the support payments that it collects on behalf of AFDC families in order to offset the costs of providing welfare benefits, until recently it only had to distribute the first $50 of each payment to the family."  *Id.* at 334 (citing 42 U.S.C. § 657(b)(1)).  "The amended version of Title IV–D replaces this $50 pass-through with more generous distributions to families once they leave welfare." *Id.* (citing 42 U.S.C. § 657(a)(2) (1994 ed., Supp. II)). "Non–AFDC recipients who request the State's aid are entitled to have all collected funds passed through. § 657(a)(3). In all cases, the State must distribute the family's share of collected support payments within two business days after receipt." *Id.* (citing § 654b(c)(1)).  The Supreme Court suggested that the requirement that the State agency pass through the first $50 of each payment collected could give rise to a "federal right to receive a specified portion of the money collected" on an individual's behalf. *Id.* at 345-46.

In the instant case, Defendant argues that the FSA provisions at issue are comparable to FERPA and Title IV-D's provisions because the FSA provisions

contain no rights-creating language and have an aggregate focus on policies and practices of the state agency as opposed to the needs of the individual. [Dkt. #19, Def. Motion to Dismiss, p. 18-22].  Defendant hinges his argument on the fact that Section 2020(e)(3) and (9) require that the State agency process food stamp applications within 30 and 7 days are phrased as required content of the State plan of operations.  Under Section 2020(d), the State agency must submit for approval a plan of operation for the food stamp program.  Section 2020(e) details specific requirements for the State plan of operation, including Section 2020(e)(3)'s requirement that the state plan shall provide that the State agency shall promptly determine the eligibility of each applicant by way of verification of income "so as to complete the certification of and provide an allotment retroactive to the period of application to any eligible household not later than thirty days following its filing of an application" and Section 2020(e)(9)'s requirement that the State plan of operation shall provide that the State agency "shall provide benefits no later than 7 days after the date of application to any household" which meet specified criteria.  7 U.S.C. 2020(e)(3) and (9).

Defendant contends that because Section 2020(e) provides the requirements for a State plan the statute has an aggregate focus on the regulated entity as opposed to the individual in line with the Western District of Texas's decision.  In that decision, the district court concluded that the statute is not directed towards individuals because 2020(e)(3) and (9) are set out in a "framework for a state plan with requirements focused on the agency regulated." *Howard*, Civ. 1:09-cv-00577-SS, p. 7.  This reasoning is unpersuasive as it is

18

entirely premised on the title of the statutory provisions at issue while ignoring the clear substance and content of these provisions.  Here, Sections 2020(e)(3) and (9) do not speak in terms of institutional policy and practice as was the case in both *Gonzaga* and *Blessing* despite the title of these provisions as "Requisites of State plan of operation."  The content and substance of these provisions are unquestionably focused on whether the needs of a particular person has been satisfied.

Moreover, the Second Circuit has refuted this logic in *Rabin* holding that there was an enforceable right in connection with a provision of the Medicaid Act requiring that each State must provide each family receiving aid pursuant to a plan of the State approved under the AFDC requirements "in at least 3 of the 6 months immediately preceding the month in which such family becomes ineligible for such aid …  shall ... remain eligible for assistance under the plan ... during the immediately succeeding 6-month period...." *Rabin*, 362 F.3d at 194 (citing Section 1396r-6(b)).  Although the Medicaid provision at issue required that the State plan "provide that eligible applicants receive aid rather than directly requiring that all eligible persons receive the assistance," the Second Circuit concluded that the language of the provision "focuses much more directly than does the FERPA provision on the individual's entitlement" and did not contain any "qualifying language akin to FERPA's 'policy and practice.'"[1]  *Id.* at 201-02.

---

[1] Although 42 U.S.C. §1320a-2 provides that "in an action brought to enforce a provision of this chapter [which includes the Medicaid statutes], such provision is not to be deemed unenforceable because of its inclusion in a section of this chapter requiring a State plan or specifying the required contents of a State plan," the Second Circuit's analysis in *Rabin* did not entirely rely on this provision in coming to its conclusion that Section 1396r-6 could support a Section 1983

The Second Circuit held that "[b]ecause all of the language of Section 1396r-6 except the "plan requirements" language, reflects Congress's intention to confer a right to TMA upon persons who meet the various eligibility requirements, we find that Section 1396r-6 can support a Section 1983 claim.  *Id.* at 202.[2]

As was the case in *Rabin*, Sections 2020(e)(3) and (9) focus  directly on the individual entitlement and contain no qualifying language akin to FERPA's policy and practice.  Sections 2020(e)(3) and (9)'s requirements that the State process food stamp applications and provide benefits to eligible households within 30 days and 7 days for households eligible for expedited food stamps unambiguously provide a precise benefit to identifiable individuals unlike FERPA's provision directing that funds not be made available to an agency which has a prohibited policy or practice.  The provision in FERPA is readily distinguishable from the FSA provisions at issue.  FEPRA merely provided an incentive for an education agency or institution to adopt a particular policy or practice as opposed to a mandate that the education agency or institution be

---

claim.  The Second Circuit pointedly distinguished Section 1396r-6 from the FERPA provision at issue in *Gonzaga* to conclude that the Congress conferred an enforceable right.

[2] Defendant contends that the Second Circuit's approach to *Gonzaga* has been inconsistent as illustrated by the contrary outcomes reached in *Rabin* and *Taylor v. Vermont Dep't of Ed.,* 313 F.3d 768 (2d Cir.2002) and suggests the Court apply *Taylor*'s approach.  In *Taylor,* the Second Circuit considered a records-access provision of FERPA and noted that the statute "combines elements of both the funding-prohibition language that the *Gonzaga* Court held does not confer an individual right and the individually focused language that evidences an intent to create an enforceable right." 313 F.3d at 785. However, the Second Circuit concluded that the structure of the statute, in which the first sentence focuses on the Secretary of Education's obligations, evinces an intent that the second sentence is merely "a limitation on which records schools should make available," and not a right enforceable under § 1983.  *Id.*  However this Court agrees with the *Williston* court that "when comparing the outcomes of *Rabin* and *Taylor,* the Circuit did not reach different outcomes when applying the *Gonzaga* test to like statutes.  Rather, the Circuit arrived at different outcomes because the statutes at issue were different."  *Willison v. Eggleston,* 410 F.Supp.2d 274, 277 (S.D.N.Y. 2006).  Because the FSA does not contain similar funding prohibition language, the Second Circuit's decision in *Taylor* is not as persuasive or guiding in the instant case.

required to do so.  Under the FSA, the State has no choice or discretion in its plan of operation but is required to process and provide specific benefits to eligible individuals within specified time-frames under its plan.  The mere fact that these mandates are embedded within the requirements for a State plan do not make these provisions one of institutional policy or practice particularly, whereas here, the language of the provisions are written in highly specific terms focused on the needs of the individuals protected.[3]  Sections 2020(e)(3) and (9) are clearly phrased in the terms of the person benefited and not in terms of aggregate policy and practice of the State agency.  Unlike *Gonzaga*, these provisions are not two steps removed from the interests of eligible individuals.

Defendant also argues in line with the Western District of Texas decision that there is no rights creating-language because Sections 2020(e)(3) and (9)'s requirements are phrased as the State agency shall provide the benefit within the specified time-frames rather than directly requiring that all eligible individuals shall be provided the benefit within the specified time-frames.  Defendant attempts to buttress this argument by referring to Title VI and Title IX which are phrased as no person shall be subjected to discrimination.  However this is a distinction without a meaningful difference.  This line of reasoning implies that the statute would be focused on the benefitted class if the phrases constituting the sentence were simply reversed to specify that eligible individuals shall be

---

[3] The conclusion that it is immaterial that Section 2020(e)(3) and (9)'s directives are embedded within the requirements for a State plan is bolstered by the Supreme Court's conclusion in *Blessing* that Title IV-D may give rise to enforceable rights despite that the fact that Title IV-D's requirements are likewise embedded within the requirements for a State plan.  The Supreme Court strongly suggested that 42 U.S.C. § 657(b)(1) could give rise to an enforceable right despite the fact that the provision was embedded within the framework of a State plan.

provided with the benefit within the specified time-frames by the State agency under the plan of operation.  However the actual meaning of these provisions do not change regardless if the provisions were phrased as the "State agency shall provide the benefit" versus "eligible individuals shall be provided the benefit by the State agency."   Either way these provisions are phrased in rights-creating language with an unmistakable focus on the benefitted class much like Title VI and Title IX.[4]   *See Sabree v. Richman*, 367 F.3d 180, 190 (3d Cir. 2004) ("Viewing Titles VI and IX, we find it difficult, if not impossible, as a linguistic matter, to distinguish the import of the relevant Title XIX language-"A State plan must provide"-from the "No person shall" language of Titles VI and IX" as both employ terms that are mandatory rather than precatory and individually focused.").

In addition, Sections 2020(e)(3) and (9) of the FSA are also distinguishable from the provisions of Title IV-D which the Supreme Court concluded did not confer enforceable rights.  In *Blessing*, the respondents argued that the enforcement provision of Title IV-D which included the "substantial compliance" standard was the source of their enforceable rights.  The Supreme Court soundly rejected this argument noting it was incumbent on respondents to identify with particularity the rights they claimed as opposed to claiming undefined rights to Title IV-D as an undifferentiated whole.  520 U.S. at 342.  The Supreme Court therefore held that the enforcement standard itself could not provide a basis for a private right of action to enforce each and every Title IV-D specification.  In the

---

[4] This  conclusion is also bolstered by the Supreme Court's conclusion in *Blessing* that Title IV-D and in particular 42 U.S.C. § 657 may give rise to enforceable rights despite the fact that § 657 is phrased as "State shall pay" the individual as opposed to the individual shall be paid by the State.

instant case, the Plaintiffs do not argue that the enforcement mechanism in Section 2020(g) of the FSA is the source of their enforceable rights.   The Plaintiffs clearly heeded the Supreme Court's advice in *Blessing* and specified particular rights based on specific provisions of the FSA.  Consequently, the Plaintiffs have identified explicit directives under the FSA to the State agency to provide food stamps within specific time-frames reflective of individual entitlements to services unrelated to any performance standards.  As the Plaintiffs point out, nowhere in the language of Sections 2020(e)(3) and (9) is there a standard directed to a yardstick for measuring system-wide performance. The Supreme Court also explained in *Blessing* that many of Title IV-D specifications did not give rise to federal rights because the link between those specifications and the services provided to the individual was far too tenuous.  *Id.* at 345.  In contrast, the link between Sections 2020(e)(3) and (9)'s directive to provide food stamps within specific time-frames and the services provided to the individuals under the FSA is far from tenuous.  Indeed, the link could not be any more direct.

Defendant argues that the enforcement mechanism under Section 2020(g) of the FSA is further evidence that Congress did not intend to confer enforceable rights.  First, Defendant appears to suggest that the enforcement mechanism under Section 2020(g) of the FSA which triggers administrative action where there is a "pattern of lack of compliance" is somehow akin to the "substantial compliance" standard in *Blessing* and inconsistent with the existence of individual rights.  Defendant contends that Section 2020(g) of the FSA "clearly

contemplated isolated instances of noncompliance.  The provisions at issue are clearly analogous with the statutory provisions at issue in *Blessing*; just as *Blessing* understood a 'substantial compliance' standard as effectively focusing on aggregate, not individual rights…" [Dkt. #19, p. 26].  However Defendant misunderstands the Supreme Court's holding in *Blessing* which considered whether the enforcement provision itself could be the source of undefined enforceable rights.  This Court agrees that Section 2020(g) is focused on the aggregate practices of the State agency and not directly on the needs of any particular individual.  However, Plaintiffs do not base their claim on Section 2020(g) and instead identify other provisions which as discussed above are undeniably focused on the needs of identified individuals and not on the aggregate practices of the State agency.  The fact that Section 2020(g) is aggregate focused does not change the fact that Sections 2020(e)(3) and (9) are focused on the individual.  This conclusion is once again bolstered by the fact that the *Blessing* court did not foreclose the possibility that some provisions of Title IV-D may give rise to enforceable individual rights despite the existence of the substantial compliance provision.

Second, Defendant argues more generally that the overall structure of the FSA which provides for enforcement by the Secretary under 2020(g) is further evidence that Congress did not intend to create enforceable rights as was the case in *Gonzaga*.  The *Gonzaga* court noted that its conclusion was buttressed by the fact that the Secretary of Education was expressly authorized to deal with violations of the act and required to establish a board to investigate and

adjudicate complaints which may be filed concerning alleged violations of FERPA.  536 U.S. at 289-90.  The Supreme Court concluded that these "administrative procedures squarely distinguish this case from *Wright* and *Wilder*, where an aggrieved individual lacked any federal review mechanism … and further counsel against our finding a congressional intent to create individually enforceable rights."  536 U.S. at 289-90 (citing *Wright*, 479 U.S. 418 and *Wilder*, 496 U.S. 498).  However, Section 2020(g)'s administrative procedures are readily distinguishable from FERPA's because an aggrieved individual lacks any federal review mechanism under the FSA.

As the Plaintiffs point out under Section 2020(g) "no federal entity or systematic process is established to address individual complaints to the Secretary…[t]he Statue merely provides contingent federal compliance attempts directed to the state."  [Dkt. #25, Pl. Mem., p. 34].   Section 2020(g) authorizes the Secretary "upon receiving information evidencing a pattern of lack of compliance by a State agency" to allow the State to attempt to correct such failure.  If the State fails to correct the failure, the FSA requires the Secretary to withhold funds. The FSA also allows the Secretary in his or his discretion to refer the matter to the Attorney General to seek injunctive relief.  7 U.S.C. §2020(g).  The authority to withhold funds enables the Secretary to shift the monetary burden of systemic dilatory processing of food stamp applications to the state, fostering compliance and assuring that needy families are not deprived of sustenance.

Section 2020(g) stands in sharp contrast to FERPA's Section 1232g(g) which mandates that the Secretary establish a review board to investigate,

25

process, review, and adjudicate violations of FERPA and "complaints which may be filed concerning alleged violations of this section." 20 U.S.C. 1232g(g).  Not only does Section 2020(g) not afford a remedy to an aggrieved individual, it appears to only afford prospective relief in the event that there is a great number of eligible individuals who did not receive foods stamps in accordance with 2020(e)(3) and (9)'s clear directives over a long period of time.  Because an aggrieved individual lacks any federal review mechanism under the FSA and because the FSA's enforcement mechanism is focused on reducing future violations on a systematic level and not addressing any aggrieved individual's injury, the structure of the FSA under Section 2020(g) does not indicate that Congress intended to foreclose a Section 1983 remedy which is essential to assuring the health and welfare of indigent families.[5]

Although Defendant substantially relies on Section 2020(g)'s enforcement mechanism as evidence that Congress did not confer an enforceable right, Defendant appears to stop just short of arguing that Section 2020(g) is sufficiently comprehensive to offer an independent basis for precluding private

---

[5] Defendant also relies on *Almendares v. Palmer*, No.300-cv-7524, 2002 WL 31730963 (N.D. Ohio Dec. 3, 2002) in support of his argument that the FSA does not create a private right of action. *Almendares* involved a claim that defendants violated the FSA by failing to ensure the adequate provision of bilingual program informational materials and notices and bilingual staff or interpreters under the food stamp program. The *Almendares* court appropriately found that the provision of the FSA at issue was aggregate focused because the state plan was to provide for "appropriate bilingual personnel and printed material... [of the state] in such a substantial number of members of low-income households speak a language other than English." 2002 WL 31730963, at *5 (citing 7 U.S.C. §2020(E)(1)(B)).  Because the *Almendares* court did not interpret Section 2020(e)(3) or (9), its reasoning on an entirely different provision is irrelevant to this Court's analysis.  In addition although *Almendares* "acknowledged that [t]he administrative scheme is only evidence of Congress intent not to create an individually enforceable private right. The administrative scheme in the Food Stamp Act is not the type of remedial scheme sufficiently comprehensive to supplant a 1983 claim."  *Williston*, 379 F.Supp.2d at 577.

enforcement.  Even if Defendant had not stopped short, it is clear that Section 2020(g) does not create a comprehensive enforcement scheme that is incompatible with individual enforcement under Section 1983.  As discussed above, Section 2020(g)'s enforcement mechanism is only triggered if there are systematic, widespread and prolonged violations of the FSA.  In addition, there is no guarantee that the Secretary will actually seek injunctive relief which would only have the effect of preventing future violations and not provide intended beneficiaries of the program essential nutrition.  It is inconceivable how individual enforcement would be incompatible and inconsistent with the FSA where Section 2020(g) contains no mechanism for an aggrieved individual to obtain federal review and redress for their injury.  As Plaintiffs emphasize there is no evidence or other indication that a private right of action will lead to "interference" with any administrative efforts by the Secretary to effect compliance under Section 2020(g).  [Dkt. #25, p. 36-37].   The administrative enforcement mechanism provided in Section 2020(g) clearly complements not displaces individual private enforcement.

Moreover, the Supreme Court has "stressed that a plaintiff's ability to invoke § 1983 cannot be defeated simply by the availability of administrative mechanisms to protect the plaintiff's interests." *Blessing*, 520 U.S. at 347 (internal quotation marks and citations omitted).  In *Blessing*, the Supreme Court explained that generalized administrative powers including the ability to audit and cut off federal funding was not sufficient to demonstrate congressional intent to foreclose a Section 1983 remedy.  *Id.* (citing Wright, 479 U.S. at 428 and Wilder,

496 U.S. at 521).  Even where "oversight powers were accompanied by limited state grievance procedures for individuals, [the Supreme Court] has found that §1983 was still available."  *Id.*  Lastly, the Supreme Court in *Blessing* remarked that "even assuming the Secretary's authority to sue for specific performance, Title IV-D's administrative enforcement arsenal" would still not be sufficiently comprehensive to demonstrate a congressional intent to withdraw a Section 1983 remedy.  *Id.*  Here, the Secretary's administrative arsenal under Section 2020(g) is no greater than the arsenal the Supreme Court examined in *Blessing*.  Under the FSA, the Secretary only has the power to cut off funding and in its discretion may seek injunctive relief which is analogous to a suit for specific performance. This is clearly not enough under Supreme Court precedent to "close the door on §1983 liability."  *Id.*

Although the Court need not consider the legislative history of the FSA in coming to its conclusion that Sections 2020(e)(3) and (9) create enforceable rights because the text of these provisions and the structure of the statute unambiguously create binding and mandatory obligations on the State, the legislative history only confirms this conclusion.  Both the House and Senate Committees unequivocally stated that the administrative remedies under the FSA do not abrogate any private cause of action.  *See* H.R. Rep. No.95-464, at 398 (1977) ("The administrative remedies against the state contained in section 11(f) [now Section 2020(g)] and elsewhere should not be construed as abrogating in any way private causes of action against states for failure to comply with Federal statutory or regulatory requirements."); S. Rep. No.95-180, at 152 ("This provision

does not abrogate private causes of action against States for failure to comply with Federal statutory or regulatory requirements.").   In addition, Senator McGovern stated that "[w]hile we expect that power to seek injunctive relief will enable the Secretary to bring about State compliance more quickly than in the past, it would be naïve to overlook the old adage about the wheels of bureaucracy turning slowly.  Thus, … this section is not to be interpreted as interfering in any way with the right of individual recipients or groups of recipients, in class actions or otherwise to take their case to court."  123 Cong. Rec. 16,349 (1977).  The Court's conclusion which is based on the text and structure of Sections 2020(e)(3) and (9) is further underscored by examination of the legislative history.

Lastly, Defendant argues that FSA regulations "demonstrate that the State agency's eligibility determination is a funding obligation of the secretary."  [Dkt. #19, p.35].  Defendant contends that FSA "regulations demonstrate that the food stamp agency is not even subject to a 'duty,' enforceable by the Secretary, to have an eligibility determination made within 30 days …because the regulations themselves in many instances prohibit the food stamp agency from making an eligibility determination within 30 days."  *Id.* at 36.  Defendant points to detailed regulations concerning the responsibilities of applicants and argues that delay can result due to the applicant's fault.  *Id.* (citing 7 C.F.R. §273.2).  Defendant essentially argues there can be no private right of action where these FSA regulations effectively "do not require DSS to process Food Stamp applications within 30 days."  *Id.*  Defendant makes several other similar arguments regarding FSA regulations which he curiously contends are entitled to *Chevron* deference.

*Id.* at 45.  Defendant argues that FSA regulations contradict the existence of any enforceable right.  [Dkt. #33, p. 3].  The Plaintiffs argue the exact opposite concluding that a "comprehensive review of the [FSA] regulations reveal the Secretary's mandate that the states process applications within the respective time periods." [Dkt. #25, p.41-43].  However, as Defendant acknowledges, "it is improper to look to any implementing federal regulations on the threshold issue of whether Congress clearly and unambiguously intended to created individual rights."  *Id.* at 36. Therefore both Defendant and Plaintiffs' arguments regarding FSA regulations do not disturb this Court's conclusion that Sections 2020(e)(3) and (9) create enforceable private rights.

In sum an analysis of the factors articulated in *Blessing* and clarified in *Gonzaga* confirms that Sections 2020 (e)(3) and (9) of the FSA confer private rights of action as these provisions are intended to benefit the particular individuals who, like the Plaintiffs, have filed applications establishing their eligibility for food stamps and who do not receive food stamps within the time mandated by the FSA.  Accordingly, Sections 2020 (e)(3) and (9) imposes on States a binding obligation to provide food stamps within the specified time frames to eligible applicants, rather than merely a congressional preference for a certain kind of conduct and are not so vague and amorphous as to be beyond the competence of the judiciary to enforce.  As discussed above, the right of eligible individuals to have food stamps provided within the specified time-frames was unambiguously conferred in the text and structure of the statute. These provisions of the FSA are clearly not concerned with aggregate services, policies

and practices of the regulated agency but instead concerned with whether the needs of any particular person have been satisfied. *Accord Willingston*, 379 F.Supp. 2d at 575 ("The provisions of the FSA here appear to relate to the individual household that applies for benefits … with respect to a specific relief to a specific class of beneficiaries and time frames within which eligible households must receive the benefits provided. Rather than having an 'aggregate focus,' the FSA does establish specific rights for individual households applying for food stamps and for eligible households to receive food stamps in a timely manner"); *M.K.B.*, 445 F.Supp.2d at 428 (concluding that both 2020(e)(3) and (9) are plainly intended to benefit the plaintiffs and the obligations imposed are neither vague nor amorphous; and speak in mandatory terms); *Reynolds*, 2005 WL 342106, at *15-16 ("Congress intended those provisions to benefit eligible applicants such as plaintiffs, the provisions are unambiguous and they impose unequivocal obligations on the states"). The Court therefore finds that Sections 2020 (e)(3) and (9) confer federal rights enforceable under Section 1983 and denies Defendant's motion to dismiss.

### B.  Plaintiffs' Motion for Preliminary Injunction

<u>Legal Standard</u>

"Generally, a party seeking a preliminary injunction must show that it will suffer irreparable harm if the injunction is not issued, and, in addition, 'either (1) that it is likely to succeed on the merits of the action, or (2) that there are sufficiently serious questions going to the merits to make them a fair ground for

litigation, provided that the balance of hardships tips decidedly in favor of the moving party.'" Mitchell V. City of New Haven, 854 F.Supp.2d 238, 244 (D. Conn. 2012) (quoting *Mullins v. City of N.Y.,* 626 F.3d 47, 53 (2d Cir.2010)).  "Moreover, when, as here, the injunction sought is mandatory, rather than prohibitory, such that it will alter, rather than preserve, the status quo, the party seeking the injunction must make a 'clear' or 'substantial' showing of a likelihood of success."  *M.K.B.,* 445 F.Supp. 2d at 426 (quoting *Jolly v. Coughlin,* 76 F.3d 468, 473 (2d Cir.1996)).

<u>Analysis</u>

Defendant primarily argues that the Plaintiffs cannot demonstrate a likelihood of success on the merits because there is no private right of action available to enforce Sections 2020(e)(3) and (9).  For the aforementioned reasons, the Court finds that Sections 2020 (e)(3) and (9) confer federal rights enforceable under Section 1983 and therefore Defendant's principal argument against granting a preliminary injunction is not persuasive.

The Court notes that the parties have raised several other arguments and lines of reasoning in their motion papers which are not entirely relevant to the question of whether preliminary injunctive relief is appropriate in the first instance and go more to question of what type of injunctive relief should be entered.  In addition, Defendant presents many of these arguments in support of his contention that the FSA does not confer a private right of action.  Distilling those arguments from that framework, one of Defendant's main concerns is that

the proposed class is too broad as it includes applicants who suffered a delay due to their own fault.  The parties devote a significant portion of their motion papers describing a myriad of FSA regulations governing the allocation of responsibility for delay and applicant responsibilities more generally.

The process to obtain food stamps appears to begin with the submission of an initial application.  After the initial application is submitted, DSS requires an applicant to produce "common sense verification" and schedules an interview prior to making its eligibility determination.  [Dkt. #38, p. 11].  Implicit within Sections 2020(e)(3) and (9) mandates that food stamps be provided within 30 and 7 days is the condition precedent that the applicant has submitted all of the required information/ documentation and been provided with a  timely interview. The Court agrees with Defendant that it would inappropriate to find DSS in violation of Sections 2020(e)(3) and (9) where the delay was truly caused by the applicant.  However there is no question that where the applicant fulfilled his or her obligations and DSS failed to schedule a timely interview, regularly loses applicant paperwork as was the case for the named Plaintiff and which the Defendant concedes is a systemic problem which it has been working to resolve for several years, or simply failed to make a timely determination, DSS would be in clear violation of Sections 2020(e)(3) and (9).

To the extent that Defendant's arguments regarding delay and allocation of fault can be construed as an argument that Plaintiffs have failed to demonstrate a likelihood of success, Defendant fails to provide any persuasive evidence that applicant fault is the primary reason for the delay.  Defendant points to data that

33

was collected and produced pursuant to a stipulated judgment that was entered by another court in the District of Connecticut in the 1990s involving the processing of food stamps.  *See Alvarez v. Commissioner, Department of Income Maintenance*, No.B-90-190(WWE) [Dkt. #33, Att. 1].  He argues that the *Alvarez* data indicates that the delay is caused by applicants.  However, Plaintiffs argue that the *Alvarez* data is flawed because it is inconsistent with FSA regulations governing the allocation of responsibility and therefore unreliable.  Defendant fails to provide any evidence indicating what percentage of the delay is attributable to applicants under the rubric of FSA regulations.  Without such information, the Court is disinclined to credit the *Alvarez* data at this juncture in the litigation to determine that there is not a substantial likelihood of success particularly where Plaintiffs have provided evidence that the delay is primarily caused by DSS.

First, Plaintiffs have presented evidence that the named Plaintiff, Mr. Briggs, was eligible to receive food stamps, submitted all the required documentation which was misplaced by DSS.  The Plaintiffs have therefore demonstrated the Mr. Briggs through no fault of his own was not provided with food stamps within the required time-frames in violation of Sections 2020()(3) and (9).  [Dkt. #2, Att. 2, Briggs Decl.].  Second, Plaintiffs also provide evidence that DSS has conceded in its Corrective Action Plan submitted to FNS that the root cause of the delays is the absence of automated business processes. [Dkt. #33, Roberts Aff., Ex. F at 2].  In a May 2, 2012 letter to FNS, DSS indicates that "errors occur most often at recertification and are most frequently a result of not acting

34

on information or not having documentation or records available at the time of the review.  In addition to reinforcing program rules, the Department needs to address the administrative issue of record control."  *Id.*  Third, Plaintiffs have indicated that DSS has reduced staffing by 19% between 2002 and 2009 and by another 8% in September and October 2011 despite increasing caseloads.  [Dkt. #33, Ferron-Poole Aff., ¶¶11-12].  Lastly, Plaintiffs point out that DSS's Corrective Action Plans to FNS have never asserted that the delay was attributable to applicant fault. [Dkt. #38, Potter Aff., ¶¶4-5, Atts. 3-4].

Further, Plaintiffs have presented DSS data demonstrating ongoing and systemic delays.  Between January 2010 and February 2012, the percent of applications pending over 30 days has ranged from 18% in August 2011 and May 2011 to 40% in November 2011.  In addition the percent of all decision made in a month late ranged from 20.5% in July 2011 to as many as 32% in December 2011. [Dkt. #38, p. 14].  Between August 2010 and February 2012, the percentages of expedited applications pending at the end of the month that were overdue ranged from 95% for December 2011 to 72% in June 2011.  *Id.* Expedited determinations taking more than 7 days have ranged from 35% in July 2011 to 54% in December 2011.  *Id.*  In addition, at a February 22, 2011 presentation to the Connecticut General Assembly, DSS described its food stamp "timeliness rate" as follows: 2006 -81.43%, 2007 – 82.99%, 2008-83.01%, 2009-79.11%, 2010 – 59.49%.  [Dkt. #2, p. 6].  Plaintiffs have presented evidence that there are significant delays in the processing of food stamps beyond the statutory mandates resulting from the fault of DSS.  The low levels of timeliness rates are persuasive evidence that the

State has failed to timely provide food stamps in compliance with the unambiguous mandates of Sections 2020(e)(3) and (9).

Lastly, Defendant suggests that even if there is an enforceable right, the Plaintiffs are only entitled to enforce that DSS substantially comply with the FSA because Section 2020(g) authorizes administrative enforcement upon evidence of a pattern of lack of compliance.  Plaintiffs argue that Sections 2020(e)(3) and (9) and implementing regulations mandate full compliance not substantial compliance.   The Court agrees that it would illogical to read Section 2020(g)'s "pattern of lack of compliance" trigger for administrative enforcement as imputing a substantial compliance standard into Sections 2020(e)(3) and (9) unambiguous mandate that food stamps be provided within the specified time frames.  The Southern District of New York also rejected this same argument in *Reynolds*.  The *Reynold's* court persuasively explained that this argument was "unavailing because it is the text of the Food Stamp Act … at which this Court must look in determining the level of compliance required."  2005 WL 342106, at \*17.  The *Reynold's* court reasoned that the enforcement provision under Section 2020(g) was not intended to measure what the FSA requires but only intended to measure how great a failure to meet those requirements should cause funds to be cut off.  *Id.*  (citing *Withrow v. Concannon*, 942 F.2d 1385, 1387 (9th Cir. 1991)). This Court agrees that the "language of these provisions is unambiguous and requires that the state agencies 'shall' or 'must' provide the specified benefits to eligible individuals.  The plain language thus requires that state agencies comply strictly with their obligations to provide food stamps … to eligible applicants."

36

*Id.*; *accord*, *Withdrow*, 942 F2d. 1387-88 (holding that strict not substantial compliance is required under FSA); *Haskins v. Stanton*, 794 F.2d 1273, 1277 (7th Cir. 1986) (same).

Further as the *Reynold's* court cogently explained this "interpretation does not encroach on a municipal government's conduct of its internal affairs because the Act itself imposes the burden … Nor does this holding disturb the principle that district courts have discretion when deciding whether injunctive relief is warranted.  An injunction is not required whenever an agency that is otherwise in full compliance fails in one or a very few sporadic instances. There is however, doubtless a point at which any failure of total compliance is truly *de minimus*, where the state has come to comply 'as strictly as is humanly possible,' and it is within the discretion of the district court to deny injunctive relief."  *Id.* (internal quotation marks and citations omitted).

At the preliminary injunction stage, the Plaintiffs have presented credible evidence that the state is not failing in one or a very few sporadic instances but instead that there is ongoing, persistent systemic failure to comply with the strict unambiguous mandates imposed by the FSA which warrant injunctive relief.  The Court therefore concludes that the Plaintiffs have established a clear or substantial showing of a likelihood of success on their claims.

Having established a clear or substantial likelihood of success, the Plaintiffs are only entitled to injunctive relief where they will suffer irreparable harm if the injunction is not issued.   Irreparable harm is "'the single most

important prerequisite for the issuance of a preliminary injunction.' " *Bell & Howell: Mamiya Co. v. Masel Supply Co.,* 719 F.2d 42, 45 (2d Cir.1983) (*quoting* 11 Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure, § 2948 at 431 (1st ed.1973)).

The denial of essential public benefits like food stamps which help provide for basic nutrition and sustenance undeniably constitutes irreparable harm. *See, e.g., M.K.B.*, 445 F.Supp.2d, at 437-38 ("Given the often perilous economic circumstances of the plaintiffs in this case, and those similarly situated, the denial of public benefits to such individuals unquestionably constitutes irreparable harm."); *Mass. Ass'n of Older Ams. v. Sharp,* 700 F.2d 749, 753 (1st Cir.1983); *Martin v. Weiner,* No. 06-cv-00943(SC), 2006 WL 435477, at *1 (W.D.N.Y. Feb. 21, 2006); *Reynolds,* 35 F.Supp.2d at 339 ("To indigent persons, the loss of even a portion of subsistence benefits constitutes irreparable injury."); *Cincotta v. N.Y. City Human Res. Admin.,* No. 00 Civ. 9064(JSR), 2001 WL 897176, at *12 (S.D.N.Y. August 9, 2001) ("The loss or potential loss of welfare benefits, including food stamp benefits, can constitute irreparable injury warranting the issuance of a preliminary injunction."); *Goldberg v. Kelly,* 397 U.S. 254, 264, 90 S.Ct. 1011, 1018, 25 L.Ed.2d 287 (1970) (finding that denial of welfare benefits deprive individuals "of the very means by which to live."); *Morel v. Giuliani,* 927 F.Supp. 622, 635 (S.D.N.Y.1995) ("To indigent persons, the loss of even a portion of subsistence benefits constitutes irreparable injury."). Further, the Plaintiffs have presented evidence that the deprivation of timely food stamps has caused

imminent harm that cannot be remedied through post-hoc monetary compensation. *See* [Dkt. #2, Att. 2, Briggs Decl.].

Considering the Plaintiffs' vital and essential interest in the timely receipt of food stamps and the resultant harm suffered through the loss of timely benefits, the balance of hardships tips decidedly in favor of the Plaintiffs and outweighs any injury caused by requiring the Defendant to do what was already required under the Act.  The Court agrees with the Seventh Circuit that "[b]ecause the defendants are required to comply with the Food Stamp Act under the terms of the Act, we do not see how enforcing compliance imposes any burden on them.  The Act itself imposes the burden, this injunction merely seeks to prevent the defendants from shirking their responsibilities under it.  We also fail to see how enforcing a statute designed to promote the public welfare disserves the public." *Haskins*, 794 F.2d at 1277.

The Defendant has informed the Court that DSS has undertaken various ameliorative measures to improve its timeliness rates.  However, such action while commendable does not render injunctive relief moot, nor does it deprive the Court of its authority to grant injunctive relief "or determine the question before it." *M.K.B.*, 445 F.Supp.2d, at 438; *see also Friends of the Earth Inc. v. Laidlaw Envtl. Servs.,* 528 U.S. 167, 189 (2000) ("a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice… If it did, courts would be compelled to leave the defendant free to return to its old ways."); *United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953) (claims not rendered moot because defendant would be "free

to return to his old ways.  This, together with a public interest in having the practices settled, militates against a mootness conclusion.").  As the Plaintiffs have demonstrated that they will suffer irreparable harm in the absence of injunctive relief, a clear or substantial showing of likelihood of success on the merits of their claims, and that the balance of hardships decidedly tips in their favor, this Court finds preliminary injunctive relief to be appropriate.  The Court therefore grants Plaintiffs' motion for preliminary injunction.

The Court notes that the parties dispute the definition of the proposed class and have made various arguments regarding the apportionment of fault and the relevancy of the stipulated judgment in *Alvarez* to any injunctive relief.  In light of these disputes, the Court will reserve judgment on the exact nature of the injunction that will issue.   The Court will shortly schedule a hearing to discuss the proposed class and the nature of injunctive relief that will issue.

The Court also grants Plaintiffs' motion to waive the posting of a bond required under Fed. R. Civ. P. 65(c).  The Court finds it appropriate to waive Rule 65(c)'s bond requirement in view of the facts that Plaintiffs are indigent and have brought an action that promotes the public's interest.  *See California ex rel. Van de Kamp v. Tahoe Regional Planning Agency,* 766 F.2d 1319, 1325–26, *as modified by* 775 F.2d 998 (9th Cir.1985) (finding district court properly exercised discretion to allow plaintiffs to proceed without posting a bond because district court had "discretion to dispense with the security requirement, or to request mere nominal security, where requiring security would effectively deny access to judicial review"); *Miller v. Carlson,* 768 F.Supp. 1331, 1340–41 (N.D.Cal.1991)

(bond waived as plaintiffs are "indigent persons" and the preliminary injunction "is consistent with public policy"); *Temple Univ. v. White,* 941 F.2d 201, 220 (3d Cir.1991) (upholding waiver of the bond requirement where suit was brought to enforce compliance with the Medicaid Act).

<u>Conclusion</u>

Based upon the above reasoning, Defendant's [Dkt. #19] motion to dismiss is DENIED and Plaintiff's motion [Dkt. #2] for preliminary injunction is GRANTED. The Court also GRANTS Plaintiffs' [Dkt. #3] motion for release of bond obligation.

IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: December 4, 2012